# NEW YORK *v.* CLASS

No. 84–1181.   Argued November 4, 1985—Decided February 25, 1986

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined, and in Part II of which BRENNAN, MARSHALL, and STEVENS, JJ., joined. POWELL, J., filed a concurring opinion, in which BURGER, C. J., joined, *post*, p. 120. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL and STEVENS, JJ., joined, *post*, p. 122. WHITE, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 131.

*Steven R. Kartagener* argued the cause for petitioner. With him on the briefs was *Mario Merola.*

*Marc C. Cogan* argued the cause *pro hac vice* for respondent. With him on the brief was *William E. Hellerstein.**

JUSTICE O'CONNOR delivered the opinion of the Court.

In this case, we must decide whether, in order to observe a Vehicle Identification Number (VIN) generally visible from outside an automobile, a police officer may reach into the passenger compartment of a vehicle to move papers obscuring the VIN after its driver has been stopped for a traffic violation and has exited the car. We hold that, in these circumstances, the police officer's action does not violate the Fourth Amendment.

I

On the afternoon of May 11, 1981, New York City police officers Lawrence Meyer and William McNamee observed re-

---

*\*Fred E. Inbau, Wayne W. Schmidt, James P. Manak, David Crump, Daniel B. Hales, James Murphy,* and *Francis B. Looney* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging reversal.

spondent Benigno Class driving above the speed limit in a car with a cracked windshield. Both driving with a cracked windshield and speeding are traffic violations under New York law. See N. Y. Veh. & Traf. Law §§ 375(22), 1180(d) (McKinney 1970). Respondent followed the officers' ensuing directive to pull over. Respondent then emerged from his car and approached Officer Meyer. Officer McNamee went directly to respondent's vehicle. Respondent provided Officer Meyer with a registration certificate and proof of insurance, but stated that he had no driver's license.

Meanwhile, Officer McNamee opened the door of respondent's car to look for the VIN, which is located on the left doorjamb in automobiles manufactured before 1969. When the officer did not find the VIN on the doorjamb, he reached into the interior of respondent's car to move some papers obscuring the area of the dashboard where the VIN is located in later model automobiles. In doing so, Officer McNamee saw the handle of a gun protruding about one inch from underneath the driver's seat. The officer seized the gun, and respondent was promptly arrested. Respondent was also issued summonses for his traffic violations.

It is undisputed that the police officers had no reason to suspect that respondent's car was stolen, that it contained contraband, or that respondent had committed an offense other than the traffic violations. Nor is it disputed that respondent committed the traffic violations with which he was charged, and that, as of the day of the arrest, he had not been issued a valid driver's license.

After the state trial court denied a motion to suppress the gun as evidence, respondent was convicted of criminal possession of a weapon in the third degree. See N. Y. Penal Law § 265.02(4) (McKinney 1980). The Appellate Division of the New York Supreme Court upheld the conviction without opinion. 97 App. Div. 2d 741, 468 N. Y. S. 2d 892 (1983). The New York Court of Appeals reversed. It reasoned that the police officer's "intrusion . . . was undertaken to obtain

information and it exposed . . . hidden areas" of the car, and "therefore constituted a search." 63 N. Y. 2d 491, 495, 472 N. E. 2d 1009, 1011 (1984). Although it recognized that a search for a VIN generally involves a minimal intrusion because of its limited potential locations, and agreed that there is a compelling law enforcement interest in positively identifying vehicles involved in accidents or automobile thefts, the court thought it decisive that the facts of this case "reveal no reason for the officer to suspect other criminal activity [besides the traffic infractions] or to act to protect his own safety." *Id.*, at 495–496, 472 N. E. 2d, at 1012. The state statutory provision that authorizes officers to demand that drivers reveal their VIN "provided no justification for the officer's entry of [respondent's] car." *Id.*, at 497, 472 N. E. 2d, at 1013. If the officer had taken advantage of that statute and asked to see the VIN, respondent could have moved the papers away himself and no intrusion would have occurred. In the absence of any justification for the search besides the traffic infractions, the New York Court of Appeals ruled that the gun must be excluded from evidence.

We granted certiorari, 471 U. S. 1003 (1985), and now reverse.

## II

Respondent asserts that this Court is without jurisdiction to hear this case because the decision of the New York Court of Appeals rests on an adequate and independent state ground. We disagree.

The opinion of the New York Court of Appeals mentions the New York Constitution but once, and then only in direct conjunction with the United States Constitution. 63 N. Y. 2d, at 493, 472 N. E. 2d, at 1010. Cf. *Michigan* v. *Long*, 463 U. S. 1032, 1043 (1983). The opinion below makes use of both federal and New York cases in its analysis, generally citing both for the same proposition. See, *e. g.*, 63 N. Y. 2d, at 494, 495, 472 N. E. 2d, at 1011. The opinion lacks the requisite "plain statement" that it rests on state grounds.

*Michigan* v. *Long, supra,* at 1042, 1044. Accordingly, our holding in *Michigan* v. *Long* is directly applicable here:

> "[W]hen . . . a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so." 463 U. S., at 1040–1041.

See also *California* v. *Carney,* 471 U. S. 386, 389, n. 1 (1985).

Respondent's claim that the opinion below rested on independent and adequate state *statutory* grounds is also without merit. The New York Court of Appeals did not hold that § 401 of New York's Vehicle and Traffic Law prohibited the search at issue here, but, in rejecting an assertion of petitioner, merely held that § 401 "provided no *justification*" for a search. 63 N. Y. 2d, at 497, 472 N. E. 2d, at 1013 (emphasis added). In determining that the police officer's action was prohibited, the court below looked to the Federal Constitution, not the State's statute. Moreover, New York adheres to the general rule that, when statutory construction can resolve a case, courts should not decide constitutional issues. See *Ashwander* v. *TVA,* 297 U. S. 288, 346–347 (1936) (Brandeis, J., concurring); *In re Peters* v. *New York City Housing Authority,* 307 N. Y. 519, 527, 121 N. E. 2d 529, 531 (1954). Since the New York Court of Appeals discussed both statutory and constitutional grounds, we may infer that the court believed the statutory issue insufficient to resolve the case. The discussion of the statute therefore could not have constituted an independent and adequate state ground.

## III

### A

The officer here, after observing respondent commit two traffic violations and exit the car, attempted to determine the VIN of respondent's automobile. In reaching to remove papers obscuring the VIN, the officer intruded into the passenger compartment of the vehicle.

The VIN consists of more than a dozen digits, unique to each vehicle and required on all cars and trucks. See 49 CFR § 571.115 (1984). The VIN is roughly analogous to a serial number, but it can be deciphered to reveal not only the place of the automobile in the manufacturer's production run, but also the make, model, engine type, and place of manufacture of the vehicle. See § 565.4.

The VIN is a significant thread in the web of regulation of the automobile. See generally 43 Fed. Reg. 2189 (1978). The ease with which the VIN allows identification of a particular vehicle assists the various levels of government in many ways. For the Federal Government, the VIN improves the efficacy of recall campaigns, and assists researchers in determining the risks of driving various makes and models of automobiles. In combination with state insurance laws, the VIN reduces the number of those injured in accidents who go uncompensated for lack of insurance. In conjunction with the State's registration requirements and safety inspections, the VIN helps to ensure that automobile operators are driving safe vehicles. By making automobile theft more difficult, the VIN safeguards not only property but also life and limb. See 33 Fed. Reg. 10207 (1968) (noting that stolen vehicles are disproportionately likely to be involved in automobile accidents).

To facilitate the VIN's usefulness for these laudable governmental purposes, federal law requires that the VIN be placed in the plain view of someone *outside* the automobile:

"The VIN for passenger cars [manufactured after 1969] shall be located inside the passenger compartment. It shall be readable, without moving any part of the vehicle, through the vehicle glazing under daylight lighting conditions by an observer having 20/20 vision (Snellen) whose eye point is located *outside the vehicle* adjacent to the left windshield pillar. Each character in the VIN subject to this paragraph shall have a minimum height of 4 mm." 49 CFR § 571.115 (S4.6) (1984) (emphasis added).

In *Delaware* v. *Prouse,* 440 U. S. 648, 658 (1979), we recognized the "vital interest" in highway safety and the various programs that contribute to that interest. In light of the important interests served by the VIN, the Federal and State Governments are amply justified in making it a part of the web of pervasive regulation that surrounds the automobile, and in requiring its placement in an area ordinarily in plain view from outside the passenger compartment.

B

A citizen does not surrender all the protections of the Fourth Amendment by entering an automobile. See *Delaware* v. *Prouse, supra,* at 663; *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 269 (1973). Nonetheless, the State's intrusion into a particular area, whether in an automobile or elsewhere, cannot result in a Fourth Amendment violation unless the area is one in which there is a "constitutionally protected reasonable expectation of privacy." *Katz* v. *United States,* 389 U. S. 347, 360 (1967) (Harlan, J., concurring). See *Oliver* v. *United States,* 466 U. S. 170, 177–180 (1984); *Maryland* v. *Macon,* 472 U. S. 463, 469 (1985).

The Court has recognized that the physical characteristics of an automobile and its use result in a lessened expectation of privacy therein:

"One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom

serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view." *Cardwell* v. *Lewis,* 417 U. S. 583, 590 (1974) (plurality opinion).

Moreover, automobiles are justifiably the subject of pervasive regulation by the State. Every operator of a motor vehicle must expect that the State, in enforcing its regulations, will intrude to some extent upon that operator's privacy:

> "Automobiles, unlike homes, are subject to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order." *South Dakota* v. *Opperman,* 428 U. S. 364, 368 (1976).

See also *Cady* v. *Dombrowski,* 413 U. S. 433, 441–442 (1973); *California* v. *Carney,* 471 U. S., at 392.

The factors that generally diminish the reasonable expectation of privacy in automobiles are applicable *a fortiori* to the VIN. As we have discussed above, the VIN plays an important part in the pervasive regulation by the government of the automobile. A motorist must surely expect that such regulation will on occasion require the State to determine the VIN of his or her vehicle, and the individual's reasonable expectation of privacy in the VIN is thereby diminished. This is especially true in the case of a driver who has committed a traffic violation. See *Delaware* v. *Prouse, supra,* at 659 ("The foremost method of enforcing traffic and vehicle safety regulations . . . is acting upon observed violations. *Vehicle stops for traffic violations occur countless times each day; and on these occasions, licenses and registration papers are subject to inspection and drivers without them will be as-*

*certained"*) (emphasis added). In addition, it is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile. The VIN's mandated visibility makes it more similar to the exterior of the car than to the trunk or glove compartment. The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a "search." See *Cardwell* v. *Lewis*, *supra*, at 588–589. In sum, because of the important role played by the VIN in the pervasive governmental regulation of the automobile and the efforts by the Federal Government to ensure that the VIN is placed in plain view, we hold that there was no reasonable expectation of privacy in the VIN.

We think it makes no difference that the papers in respondent's car obscured the VIN from the plain view of the officer. We have recently emphasized that efforts to restrict access to an area do not generate a reasonable expectation of privacy where none would otherwise exist. See *Oliver* v. *United States*, *supra*, at 182–184 (placement of "No Trespassing" signs on secluded property does not create "legitimate privacy interest" in marihuana fields). Here, where the object at issue is an identification number behind the transparent windshield of an automobile driven upon the public roads, we believe that the placement of the obscuring papers was insufficient to create a privacy interest in the VIN. The mere viewing of the formerly obscured VIN was not, therefore, a violation of the Fourth Amendment.

## C

The evidence that respondent sought to have suppressed was not the VIN, however, but a gun, the handle of which the officer saw from the interior of the car while reaching for the papers that covered the VIN. While the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protec-

tion from unreasonable intrusions by the police. We agree with the New York Court of Appeals that the intrusion into that space constituted a "search." 63 N. Y. 2d, at 495, 472 N. E. 2d, at 1011. Cf. *Delaware* v. *Prouse*, 440 U. S., at 653 ("[S]topping an automobile and detaining its occupants constitute a 'seizure' . . . even though the purpose of the stop is limited and the resulting detention quite brief"). We must decide, therefore, whether this search was constitutionally permissible.

If respondent had remained in the car, the police would have been justified in asking him to move the papers obscuring the VIN. New York law authorizes a demand by officers to see the VIN, see 63 N. Y. 2d, at 496–497, 472 N. E. 2d, at 1012–1013, and even if the state law were not explicit on this point we have no difficulty in concluding that a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop. See *Prouse, supra,* at 659. If respondent had stayed in his vehicle and acceded to such a request from the officer, the officer would not have needed to intrude into the passenger compartment. Respondent chose, however, to exit the vehicle without removing the papers that covered the VIN; the officer chose to conduct his search without asking respondent to return to the car. We must therefore decide whether the officer acted within the bounds of the Fourth Amendment in conducting the search. We hold that he did.

Keeping the driver of a vehicle in the car during a routine traffic stop is probably the typical police practice. See D. Schultz & D. Hunt, Traffic Investigation and Enforcement 17 (1983). Nonetheless, out of a concern for the safety of the police, the Court has held that officers may, consistent with the Fourth Amendment, exercise their discretion to require a driver who commits a traffic violation to exit the vehicle even though they lack any particularized reason for believing the driver possesses a weapon. *Pennsylvania* v. *Mimms*, 434

U. S. 106, 108–111 (1977) *(per curiam)*. While we impute to respondent no propensity for violence, and while we are conscious of the fact that respondent here voluntarily left the vehicle, the facts of this case may be used to illustrate one of the principal justifications for the discretion given police officers by *Pennsylvania* v. *Mimms:* while in the driver's seat, respondent had a loaded pistol at hand. *Mimms* allows an officer to guard against that possibility by requiring the driver to exit the car briefly. Clearly, *Mimms* also allowed the officers here to detain respondent briefly outside the car that he voluntarily exited while they completed their investigation.

The question remains, however, as to whether the officers could not only effect the seizure of respondent necessary to detain him briefly outside the vehicle, but also effect a search for the VIN that may have been necessary only because of that detention. The pistol beneath the seat did not, of course, disappear when respondent closed the car door behind him. To have returned respondent immediately to the automobile would have placed the officers in the same situation that the holding in *Mimms* allows officers to avoid—permitting an individual being detained to have possible access to a dangerous weapon and the benefit of the partial concealment provided by the car's exterior. See *Pennsylvania* v. *Mimms, supra,* at 110. In light of the danger to the officers' safety that would have been presented by returning respondent immediately to his car, we think the search to obtain the VIN was not prohibited by the Fourth Amendment.

The Fourth Amendment by its terms prohibits "unreasonable" searches and seizures. We have noted:

> "[T]here is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' *Camara* v. *Municipal Court,* 387 U. S. 523, 534–535, 536–537 (1967). And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with

rational inferences from those facts, justifiably warrant that intrusion." *Terry* v. *Ohio*, 392 U. S. 1, 21 (1968) (footnote omitted) (brackets as in *Terry*).

This test generally means that searches must be conducted pursuant to a warrant backed by probable cause. See *United States* v. *Ventresca*, 380 U. S. 102, 105–109 (1965); *United States* v. *Karo*, 468 U. S. 705, 714–715 (1984). When a search or seizure has as its immediate object a search for a weapon, however, we have struck the balance to allow the weighty interest in the safety of police officers to justify warrantless searches based only on a reasonable suspicion of criminal activity. See *Terry* v. *Ohio, supra; Adams* v. *Williams*, 407 U. S. 143 (1972). Such searches are permissible despite their substantial intrusiveness. See *Terry* v. *Ohio, supra*, at 24–25 (search was "a severe, though brief, intrusion upon cherished personal security, and . . . must surely [have] b[een] an annoying, frightening, and perhaps humiliating experience").

When the officer's safety is less directly served by the detention, something more than objectively justifiable suspicion is necessary to justify the intrusion if the balance is to tip in favor of the legality of the governmental intrusion. In *Pennsylvania* v. *Mimms, supra*, at 107, the officers had personally observed the seized individual in the commission of a traffic offense before requesting that he exit his vehicle. In *Michigan* v. *Summers*, 452 U. S. 692, 693 (1981), the officers had obtained a warrant to search the house that the person seized was leaving when they came upon him. While the facts in *Pennsylvania* v. *Mimms* and *Michigan* v. *Summers* differ in some respects from the facts of this case, the similarities are strong enough that the balancing of governmental interests against governmental intrusion undertaken in those cases is also appropriate here. All three of the factors involved in *Mimms* and *Summers* are present in this case: the safety of the officers was served by the governmental intrusion; the intrusion was minimal; and the search stemmed

from some probable cause focusing suspicion on the individual affected by the search. Indeed, here the officers' probable cause stemmed from directly observing respondent commit a violation of the law.

When we undertake the necessary balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion," *United States* v. *Place*, 462 U. S. 696, 703 (1983), the conclusion that the search here was permissible follows. As we recognized in *Delaware* v. *Prouse*, 440 U. S., at 658, the governmental interest in highway safety served by obtaining the VIN is of the first order, and the particular method of obtaining the VIN here was justified by a concern for the officers' safety. The "critical" issue of the intrusiveness of the government's action, *United States* v. *Place, supra,* at 722 (BLACKMUN, J., concurring in judgment), also here weighs in favor of allowing the search. The search was focused in its objective and no more intrusive than necessary to fulfill that objective. The search was far less intrusive than a formal arrest, which would have been permissible for a traffic offense under New York law, see N. Y. Veh. & Traf. Law § 155 (McKinney Supp. 1986); N. Y. Crim. Proc. Law § 140.10(1) (McKinney 1981), and little more intrusive than a demand that respondent—under the eyes of the officers—move the papers himself. The VIN, which was the clear initial objective of the officer, is by law present in one of two locations—either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile. Neither of those locations is subject to a reasonable expectation of privacy. The officer here checked both those locations, and only those two locations. The officer did not root about the interior of respondent's automobile before proceeding to examine the VIN. He did not reach into any compartments or open any containers. He did not even intrude into the interior at all until after he had checked the doorjamb for

the VIN. When he did intrude, the officer simply reached directly for the unprotected space where the VIN was located to move the offending papers. We hold that this search was sufficiently unintrusive to be constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations. Any other conclusion would expose police officers to potentially grave risks without significantly reducing the intrusiveness of the ultimate conduct—viewing the VIN—which, as we have said, the officers were entitled to do as part of an undoubtedly justified traffic stop.

We note that our holding today does not authorize police officers to enter a vehicle to obtain a dashboard-mounted VIN when the VIN is visible from outside the automobile. If the VIN is in the plain view of someone outside the vehicle, there is no justification for governmental intrusion into the passenger compartment to see it.*

The judgment of the New York Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

*Petitioner invites us to hold that respondent's status as an unlicensed driver deprived him of any reasonable expectations of privacy in the vehicle, because the officers would have been within their discretion to have prohibited respondent from driving the car away, to have impounded the car, and to have later conducted an inventory search thereof. Cf. *South Dakota* v. *Opperman*, 428 U. S. 364 (1976) (police may conduct inventory search of car impounded for multiple parking violations); *Nix* v. *Williams*, 467 U. S. 431 (1984) (discussing the "inevitable discovery" exception to the exclusionary rule). Petitioner also argues that there can be no Fourth Amendment violation here because the police could have arrested respondent, see N. Y. Veh. & Traf. Law § 155 (McKinney Supp. 1986); N. Y. Crim. Proc. Law § 140.10(1) (McKinney 1981), and could then have searched the passenger compartment at the time of arrest, cf. *New York* v. *Belton*, 453 U. S. 454 (1981), or arrested respondent and searched the car after impounding it pursuant to the arrest, see *Cady* v. *Dombrowski*, 413 U. S. 433 (1973). We do not, however, reach those questions here.

JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, concurring.

I join the Court's opinion but write to emphasize that, because of the unique and important governmental interests served by inspection of the Vehicle Identification Number (VIN), an officer making a lawful stop of a vehicle has the right and duty to inspect the VIN. Where the VIN is not visible from outside the vehicle or voluntarily disclosed by the driver, the officer may enter the vehicle to the extent necessary to read the VIN.

As the Court explains, the VIN essentially is a serial number that, by identifying certain features of the vehicle to which it is affixed, provides an effective and reliable means for positive identification of the vehicle. The VIN occupies a central position in the elaborate federal and state regulation of automobiles, which frequently depends on such positive identification. Federal regulations now direct manufacturers to place the VIN in a location where it is in the plain view of an observer standing outside the vehicle. 49 CFR § 571.115 (S4.6) (1984).

The Court has answered correctly the question presented in this case by applying conventional Fourth Amendment analysis. I believe, however, that an officer's efforts to observe the VIN need not be subjected to the same scrutiny that courts properly apply when police have intruded into a vehicle to arrest or to search for evidence of crime. When an officer lawfully has stopped a motor vehicle for a traffic infraction, the officer is entitled to inspect license and registration documents. See *Delaware* v. *Prouse*, 440 U. S. 648 (1979); *Pennsylvania* v. *Mimms*, 434 U. S. 106 (1977) *(per curiam)*. Unquestionably, the officer also may look through the windshield, observe the VIN, and record it without implicating any Fourth Amendment concerns. Respondent does not contend, nor could it reasonably be contended, that such action violates the Federal Constitution. The question raised on the facts of this case, therefore, is whether the

Fourth Amendment was offended by the incremental intrusion resulting from the officer's efforts to observe this VIN once respondent's vehicle lawfully was stopped. Cf. *Pennsylvania* v. *Mimms, supra,* at 109.

The problem for the officer was that the VIN, located on the dashboard just behind the windshield, was obscured by papers. The sequence of events that transpired is well stated in the Court's opinion. Suffice it to say here that, when respondent left his vehicle to talk to one of the officers, the other officer sought to determine the VIN of the automobile. This officer did what his duty required. Because he could not see the VIN from outside the car, and because the driver had exited the vehicle, the officer entered the car to the extent necessary to move the papers covering the VIN. It was only then that he observed a handgun protruding from beneath the front seat. The Court of Appeals of New York held that this intrusion was an unlawful search. While agreeing that a search occurred, this Court today sustains the officer's action on reasoning familiar in cases applying Fourth Amendment principles to automobiles.

In my view, the Fourth Amendment question may be stated simply as whether the officer's efforts to inspect the VIN were reasonable. There is no finding in this case that the officer's entry into respondent's vehicle—opening the door and reaching his hand to the dashboard—was not reasonably necessary to achieve his lawful purpose. If respondent had remained in his seat, as the Court observes, the officer properly should have requested him to remove the papers obstructing the VIN. In the absence of compliance with such a request, an arrest would have been lawful. Cf. *People* v. *Ellis,* 62 N. Y. 2d 393, 465 N. E. 2d 826 (1984) (on lawful traffic stop, officers properly arrested driver for failure to produce license or other identification).

In view of the important public purposes served by the VIN system and the minimal expectation of privacy in the VIN, I would hold that where a police officer lawfully stops a

motor vehicle, he may inspect the VIN, and remove any obstruction preventing such inspection, where the driver of the vehicle either is unwilling or unable to cooperate.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, concurring in part and dissenting in part.

I agree that the decision of the New York Court of Appeals does not rest on an adequate and independent state ground, see *Michigan* v. *Long*, 463 U. S. 1032, 1043 (1983), and therefore join Part II of the Court's opinion. I also agree that the police conducted a *search* of respondent's vehicle to inspect the Vehicle Identification Number (VIN). *Ante*, at 114–115. However, I disagree that this *search* was constitutionally permissible, and to that extent respectfully dissent.

## I

The facts bear repetition. Officers Meyer and McNamee pulled respondent over after observing him commit minor traffic violations. Respondent emerged from his car, closed the door, and joined Officer Meyer at the rear of the vehicle. Respondent gave Officer Meyer his car registration certificate and proof of insurance, but did not have a driver's license. Meanwhile, without first examining the documents, and unaware that respondent had no driver's license, Officer McNamee opened the door of the car to look for the VIN on the doorjamb and, not finding it there, reached inside to remove papers obstructing his view of the VIN on the dashboard. While doing so, McNamee saw a gun handle protruding from underneath the driver's seat. Respondent was arrested, and eventually convicted, for criminal possession

---

*I do not suggest, of course, that the Fourth Amendment is inapplicable in this context. An officer may not use VIN inspection as a pretext for searching a vehicle for contraband or weapons. Nor may the officer undertake an entry more extensive than reasonably necessary to remove any obstruction and read the VIN.

of a weapon.  He was issued summonses for his traffic violations.

McNamee conducted the search even though "[i]t is undisputed that the police officers had no reason to suspect that respondent's car was stolen, that it contained contraband, or that respondent had committed an offense other than the traffic violations."  *Ante,* at 108.

## II

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  "This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer."  *California* v. *Carney,* 471 U. S. 386, 390 (1985).  While we have found no Fourth Amendment violation in certain warrantless police searches of cars, see, *e. g.,* *Carroll* v. *United States,* 267 U. S. 132 (1925), this narrow exception "applies only to searches of vehicles that are supported by probable cause."  *United States* v. *Ross,* 456 U. S. 798, 809 (1982).

Officer McNamee's *search* of respondent's car was clearly without probable cause and was therefore patently unconstitutional.  The Court's contrary holding rests not on any reasoning or logic grounded in Fourth Amendment jurisprudence, but rather on a strained and irrelevant analysis.  To substitute for the absence of probable cause, the Court struggles to balance "the governmental interest in highway safety served by obtaining the VIN" and a "concern for the officers' safety" against the "nature and quality" of the intrusion that took place.  *Ante,* at 118.  Once again, the Court "takes a long step . . . toward 'balancing' into oblivion the protections the Fourth Amendment affords."  *Michigan* v. *Long, supra,* at 1065 (BRENNAN, J., dissenting).  The police had no justification whatever, let alone probable cause, to *search* for the

VIN, and therefore no amount of "balancing" can make the *search* of respondent's car constitutional.

### A

The Court says much about the "important role played by the VIN in the pervasive governmental regulation of the automobile," and holds that respondent had no "reasonable expectation of privacy in the VIN." *Ante,* at 114. This aspect of the Court's analysis is particularly baffling. Of course, the VIN plays a significant part in federal and state schemes for regulating automobiles, and federal regulations require vehicle manufacturers to install VINs that may be read from outside the passenger compartment. See 49 CFR § 571.115 (S4.6) (1984). However, even assuming that respondent had no reasonable expectation of privacy in the VIN, why is this relevant to the question we decide? Officer McNamee did not look for the VIN from outside of respondent's vehicle, but *searched* the car without respondent's consent in order to locate the VIN. By focusing on the object of the search—the VIN—the Court misses the issue we must decide: whether an interior *search* of the car to discover that object was constitutional. Regardless of whether he had a reasonable expectation of privacy in the VIN, respondent clearly retained a reasonable expectation of privacy with respect to the area searched by the police—the car's interior. As the court below noted, "[t]he fact that certain information must be kept, or that it may be of a public nature, does not automatically sanction police intrusion into private space in order to obtain it." 63 N. Y. 2d 491, 495, 472 N. E. 2d 1009, 1011 (1984); cf. *id.,* at 496–497, 472 N. E. 2d, at 1012–1013 (noting that state law only requires drivers to furnish police with vehicle identification).

### B

Because vehicles are mobile and subject to pervasive government regulation, an individual's justifiable expectation of privacy in a vehicle is less than in his home. *California* v.

*Carney, supra.*   This is why the Court has held that warrantless searches of cars may sometimes not violate the Fourth Amendment, but only if the searches are supported by probable cause.   See, *e. g., Carroll* v. *United States, supra; United States* v. *Ross, supra.*   For "[a]n individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation." *Delaware* v. *Prouse,* 440 U. S. 648, 662 (1979); see also *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 269 (1973) ("[T]he *Carroll* doctrine does not declare a field day for the police in searching automobiles").   Because the Fourth Amendment constrains the State's authority to *search* automobiles under the guise of "regulation," the fact that the Government uses the VIN as part of its scheme for regulating automobiles is insufficient to justify a *search* of the passenger compartment to retrieve such information.   Rather, as is ordinarily the case with any car search, a VIN search must be supported by probable cause.   See *Almeida-Sanchez* v. *United States, supra,* at 269 ("Automobile or no automobile, there must be probable cause for the search").   "[T]o eliminate any requirement that an officer be able to explain the reasons for his actions . . . leaves police discretion utterly without limits." *Pennsylvania* v. *Mimms,* 434 U. S. 106, 122 (1977) (STEVENS, J., dissenting).   In this case, the police clearly lacked probable cause to search for the VIN.

The Court suggests that respondent's traffic infractions provided the requisite probable cause, this on the ground that there was "probable cause focusing suspicion on the individual affected by the search." *Ante,* at 118.   This analysis makes a mockery of the Fourth Amendment.   There can be no question that respondent's traffic offenses gave the police probable cause to stop the car and to demand some form of vehicle identification. *Delaware* v. *Prouse, supra,* at 663. Too, this sort of routine traffic stop generally gives police an *opportunity* to inspect the VIN through the car windshield.

But Fourth Amendment protections evaporate if this supplies the requisite probable cause to *search* for a VIN not visible from the exterior of the car. Plainly the search of the interior for the VIN was unnecessary since respondent had supplied his car registration certificate, and there is no suggestion that it was inadequate.[1]

## C

The Court supplies not an iota of reasoning to support the holding that respondent's traffic infractions gave the police probable cause to search for the VIN. The Court is content simply to conclude that "the governmental interest in highway safety served by obtaining the VIN is of the first order." *Ante*, at 118. Although I agree that the government has a strong interest in promoting highway safety, see *Delaware* v. *Prouse, supra,* at 658, I fail to see just how the VIN search conducted here advanced that interest. Despite the Court's lengthy exposition on the variety of safety-related purposes served by the VIN,[2] respondent's car was not searched to further any of the identified interests. If the officers intended to identify what they considered to be an "unsafe" vehicle, that could have been done without searching respondent's car. Thus, the mere fact that the State utilizes the VIN in conjunction with regulations designed to promote

---

[1] Indeed, the facts of this case belie any suggestion that the VIN search was needed positively to identify respondent's vehicle. Officer McNamee did not wait to see respondent's vehicle registration certificate before he started to search respondent's car, and did not record the VIN he found in order to compare it with other identifying documents.

[2] The Court notes that "[t]he ease with which the VIN allows identification of a particular vehicle assists the various levels of government in many ways." *Ante*, at 111. As examples, the Court explains that "the VIN improves the efficacy of recall campaigns," "assists researchers in determining the risks of driving various makes and models of automobiles," helps to "reduc[e] the number of those injured in accidents who go uncompensated for lack of insurance," ensures "that automobile operators are driving safe vehicles," and "[b]y making automobile theft more difficult . . . safeguards not only property but also life and limb." *Ibid.*

highway safety does not give the police a reason to *search* for such information every time a motorist violates a traffic law.[3] Absent some reason to search for the VIN, the government's admittedly strong interest in promoting highway safety cannot validate the intrusion resulting from the *search* of respondent's vehicle.

## III

The Court, relying on *Pennsylvania* v. *Mimms, supra,* and *Michigan* v. *Summers,* 452 U. S. 692 (1981), next attempts to support its holding on the ground that "[i]n light of the danger to the officers' safety [that would be] presented by returning respondent immediately to his car [to uncover the VIN,] the search to obtain the VIN was not prohibited by the Fourth Amendment." *Ante,* at 116. Neither cited decision supports this argument.

In *Summers,* police detained the occupant of a home being searched pursuant to a valid warrant. The Court held that this seizure was constitutional because it served several important law enforcement interests, including officer safety, and because the search warrant provided a reasonable basis for the police to determine that the occupant was engaged in criminal activity and should therefore be detained. 452 U. S., at 702–704. By contrast, here there was no reason for the officers to search the car to inspect the VIN. The officers knew only that respondent had committed minor traffic violations, and while this may have given them an *opportunity* to inspect the VIN, it did not provide a reason to *search* the interior of the car for it.

In *Mimms,* police stopped an automobile for a traffic infraction, and ordered the driver to step outside the vehicle. As the driver emerged, the officers noticed a large bulge

---

[3] By analogy, had respondent emerged from his car without his vehicle registration certificate or driver's license, I do not read the Court's opinion to hold that the police could have searched the passenger compartment in order to locate these documents, even though they also play important roles in the State's regulation of automobiles.

under his jacket, and after frisking him, discovered a loaded revolver. The Court held that because such actions protected officer safety, the police could legitimately order a driver out of his car when they made a lawful traffic stop. Unlike the situation in *Mimms*, the intrusion in this case— the search of respondent's vehicle—did not directly serve officer safety. Nevertheless, the Court finds that "[t]o have returned respondent immediately to the automobile [to clear the papers on the dashboard obscuring the VIN] would have placed the officers in the same situation that the holding in *Mimms* allows officers to avoid." *Ante*, at 116. Again, the Court forgets that the police, with *no reason* to search the interior, had *no reason* to return respondent to his car. Thus, the State's interest in protecting officer safety cannot validate the search.

Of course, if the officers had reasonable grounds to suspect that the traffic stop presented a threat to their safety, they would have been authorized to search respondent's vehicle for weapons. See *Michigan* v. *Long*, 463 U. S., at 1051. However, neither officer ever suggested that the situation posed any danger, and the court below specifically found that the facts "reveal no reason for the officer[s] . . . to act to protect [their] own safety." 63 N. Y. 2d, at 496, 472 N. E. 2d, at 1012. In the absence of even the slightest suspicion of danger, the search of respondent's car cannot be justified on grounds of officer safety.

### IV

Finally, the Court finds that "[t]he 'critical' issue of the intrusiveness of the Government's action . . . also here weighs in favor of allowing the search." *Ante*, at 118. The Court's effort to minimize the extent of the intrusion, see *ante*, at 118–119, won't wash. Officer McNamee clearly *searched* respondent's car by opening the door and reaching into the passenger compartment to remove papers from the dashboard. Even if he did not engage in a full-scale excavation, this *search* exposed areas of the passenger compartment not visi-

ble from outside the vehicle. "The narrow intrusions involved in [*Terry* v. *Ohio*, 392 U. S. 1 (1968), and its progeny] were judged by a balancing test rather than by the general principle that Fourth Amendment seizures must be supported by the 'long-prevailing standards' of probable cause . . . only because these intrusions fell far short of the kind of intrusion associated with an arrest." *Dunaway* v. *New York*, 442 U. S. 200, 212 (1979). That the search conducted here was substantially more intrusive than an ordinary traffic stop starkly exposes the impropriety of the Court's strained effort to sanction McNamee's patently illegal search by the balancing approach. In *United States* v. *Place*, 462 U. S. 696, 721 (1983), JUSTICE BLACKMUN too noted his concern over the "emerging tendency on the part of the Court to convert the *Terry* decision into a general statement that the Fourth Amendment requires only that any seizure be reasonable." Cf. 462 U. S., at 718 (BRENNAN, J., concurring in result); *Kolender* v. *Lawson*, 461 U. S. 352, 363 (1983) (BRENNAN, J., concurring); *Florida* v. *Royer*, 460 U. S. 491, 509 (1983) (BRENNAN, J., concurring in result).[4]

In any event, even if there had been only a limited search here that justified the Court in balancing the extent of the intrusion against the importance of the governmental interests allegedly served, this alone cannot legalize the *search* of respondent's car. In situations where the Court has approved of very limited intrusions on less than probable cause, the Court has always required that "the police officer . . . be

---

[4] "There are important reasons why balancing inquiries should not be conducted except in the most limited circumstances." *United States* v. *Place*, 462 U. S., at 718 (BRENNAN, J., concurring in result). "[T]he protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases." *Dunaway* v. *New York*, 442 U. S. 200, 213 (1979). As a general rule, "the Framers of the [Fourth] Amendment balanced the interests involved and decided that a seizure is reasonable only if supported by a judicial warrant based on probable cause." *United States* v. *Place, supra,* at 722 (BLACKMUN, J., concurring in judgment).

able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* v. *Ohio,* 392 U. S. 1, 21 (1968); see *Michigan* v. *Long, supra,* at 1049 (police must have reasonable belief that suspect is dangerous and may gain immediate control of weapons to search areas of passenger compartment where weapons may be placed or hidden); *Delaware* v. *Prouse,* 440 U. S., at 663 (police must have reasonable suspicion that motorist is unlicensed, that car is unregistered, or that either the vehicle or an occupant is otherwise subject to seizure, to stop automobile and detain driver); *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 881–882 (1975) (police must have reasonable suspicion that vehicle contains illegal aliens in order to stop the car and question occupants about citizenship). In this case, respondent's traffic infractions did not give the police a reason to search for the VIN, and the police offered no other justification that would reasonably warrant such an intrusion.

In sum, the Court's decision today is still another of its steps on the road to evisceration of the protections of the Fourth Amendment. The Court's willingness to sanction a car search that the police had no probable cause to conduct highlights this trend. However, I find the Court's holding particularly disturbing because none of the factors the Court relies upon—the lack of reasonable expectation of privacy in the VIN, the officers' observing respondent commit minor traffic violations, the government's interest both in promoting highway safety and in shielding officers from danger, and the allegedly limited nature of the search that took place— gave the police *any reason* to search for the VIN. The Court once again disregards the admonition of Justice Jackson:

> "[Fourth Amendment rights] are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the

individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government." *Brinegar* v. *United States*, 338 U. S. 160, 180 (1949) (dissenting opinion).[5]

JUSTICE WHITE, with whom JUSTICE STEVENS joins, dissenting.

The police officer involved in this case entered the interior of respondent's automobile, an area protected by the Fourth Amendment against unreasonable searches and seizures. A car may be searched without a warrant if there is probable cause to do so, but no one suggests that this precondition for a search existed here. The entry was solely to remove an obstruction that prevented the VIN from being seen from outside the car. The issue is whether the governmental interest in obtaining the VIN by entering a protected area is sufficient to outweigh the owner's privacy interest in the interior of the car. I am unprepared, at least for the reasons the Court gives, to conclude that it is.

Had Class remained in his car and refused an officer's order (1) to turn over his registration certificate and (2) to remove the article obscuring the VIN, there would have been no more justification for entering the interior of the car and doing what was necessary to read the VIN than there would have been to enter and search for the registration certificate in the glove compartment. It may be that under our cases, Class could have been sanctioned for his refusal in such a case, but we have never held that his refusal would permit a search of the glove compartment. Even if it did, it would be different if there was no refusal at all, but just an entry to

---

[5]JUSTICE POWELL, in a concurring opinion joined by THE CHIEF JUSTICE, would find that "[w]here the VIN is not visible from outside the vehicle or voluntarily disclosed by the driver, the officer may enter the vehicle to the extent necessary to read the VIN." *Ante*, at 120. Even were I to agree with this standard, in this case Officer McNamee searched respondent's car without ever asking him voluntarily to disclose the VIN's location.

find a registration certificate. If that is the case, this one is no different in kind: there was no refusal and nothing but a nonconsensual entry to search without probable cause and without emergent circumstances.

It makes no difference that the law requires the VIN to be visible from outside the car. Otherwise, a requirement that the VIN be carried in a prominent location in the trunk of the car would justify searches of that area whenever there was a stop for a traffic violation. I thus do not join the Court's opinion, which in effect holds that a search of a car for the VIN is permissible whenever there is a legal stop, whether or not the driver is even asked to consent.

Nevertheless, Class was unlicensed and the police were not constitutionally required merely to give him a citation and let his unlicensed driving continue. Arguably, one of the officers legally could have driven the car away himself and in the process noticed the gun; the car could have been towed and inspected at the station; or Class could have been arrested for driving without a license and the entire car searched. But the Court eschews these possible alternative rationales and rests its judgment on grounds that I do not accept.