[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17125
Non-Argument Calendar

_____

D.C. Docket No. 6:16-cr-00080-PGB-TBS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

QUARDARIUS JALOUIS DEMETRIC ARKEEM HOLLEY,
a.k.a. Quad Holley,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 26, 2017)

Before MARCUS, JORDAN and ROSENBAUM, Circuit Judges.

PER CURIAM:

Quardarius Jalouis Holley appeals his convictions for possession with intent

to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and for possession of

a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  On appeal, he challenges the district court's denial of his motion to suppress all evidence, including crack cocaine, cocaine powder, marijuana, and a handgun, seized during a traffic stop.  He argues that the district court erroneously applied New York v. Class, 475 U.S. 106 (1986), to conclude that the investigating officers could lawfully open the door of the rental car he was driving to test whether the darkness of the window tint violated Florida Statutes § 316.2953.  After careful review, we affirm.

We apply a mixed standard of review to a district court's denial of a motion to suppress, reviewing the district court's factual findings for clear error and its legal determinations de novo.  United States v. McCullough, 851 F.3d 1194, 1199 (11th Cir.), cert. denied, 137 S. Ct. 2173 (2017).  We view the evidence in the light most favorable to the prevailing party.  Id.  Additionally, we defer to the credibility determinations of the factfinder "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it."  United States v. Holt, 777 F.3d 1234, 1255 (11th Cir. 2015) (quotation omitted)).  We may affirm the denial of a motion to suppress on any ground supported by the record.  United States v. Caraballo, 595 F.3d 1214, 1222 (11th Cir. 2010).

2

The Fourth Amendment's protection from unreasonable searches and seizures includes traffic stops. McCullough, 851 F.3d at 1201. Police may lawfully stop a car based on probable cause that a traffic violation has occurred. United States v. Pierre, 825 F.3d 1183, 1192 (11th Cir. 2016), cert. denied, 137 S. Ct. 698 (2017). Police have probable cause to stop a car when the available facts and circumstances would suggest to a reasonable person that an offense has been committed. Id. Florida Statutes § 316.2953 makes it a traffic violation to drive with illegally dark tints, which is a valid basis for a traffic stop. Id. An officer's actions during the stop must be "reasonably related in scope" to the original justification for the stop. Holt, 777 F.3d at 1256 (emphasis omitted).

Due to pervasive government regulation of cars, drivers should expect that the government will need to intrude on their privacy in order to enforce those regulations. Class, 475 U.S. at 113. For example, police officers are authorized to stop and examine vehicles for expired tags, for operating violations, or for inoperable safety equipment. Id. In Class, officers initiated a traffic stop based on two traffic violations. Id. at 108. After the driver voluntarily got out of the car to give his information to one of the officers, the other officer opened the door of the car, reached inside to move some papers to locate the vehicle identification number ("VIN") on the dashboard, and observed a gun under the driver's seat. Id. In concluding that the gun was admissible because it was discovered in plain sight

3

during a reasonable search to locate the VIN, see id. at 111-19, the Supreme Court considered that the driver did not have a reasonable expectation of privacy in the VIN because it was an important part of government regulation of vehicles, with a direct relation to officer and public safety, and was required to be located in a place ordinarily in plain view from the exterior of the car. Id. at 111-14.  The Supreme Court then determined that the search to uncover the VIN was reasonable because the safety of the officers was served by the governmental intrusion, the intrusion was minimal, and the search stemmed from some probable cause focusing suspicion on the individual affected by the search. Id. at 111-18.

In concluding that officer safety was served by the intrusion, the Supreme Court considered both the safety reasoning behind the regulation of VINs and officer safety in executing traffic stops in light of Pennsylvania v. Mimms, 434 U.S. 106 (1977), where it determined that the police can require a driver to get out of the car during a traffic stop without having a specific belief that the driver has a weapon. Class, 475 U.S. at 115-18.  The Supreme Court noted that if the driver stayed in the car, the officers would have been justified in having him move the papers to reveal the VIN. Id. at 115.  Following Mimms, the Supreme Court concluded that returning the driver to the car to have him move the papers would have placed the officers in the type of situation Mimms sought to avoid by allowing a detained individual access to a "dangerous weapon and the benefit of

4

the partial concealment provided by the car's exterior." Id. at 116. The Supreme Court then determined that the intrusion of opening the car door was minimal because the search was narrowly focused on obtaining the VIN and did not extend beyond what the officer could see in plain sight. Id. at 118-19. Additionally, the Supreme Court concluded that the search stemmed from probable cause focusing suspicion on the driver because the search for the VIN was directly related to the lawful traffic stop. Id. at 118.

Here, the essential facts are these. On March 1, 2016, officers Giglietta and Singleton, of the Sanford Police Department, initiated a traffic stop of a vehicle because the driver, Holley, failed to stop completely at a stop sign and because the car's window tint darkness appeared to exceed what was permitted under Florida law. When the traffic stop was initiated, Holley parked the car in the driveway of a relative's house, got out, and headed toward the front door of the house. Holley then did not comply with the officer's command to stop, ran toward the house, and was tased as he entered the door and apprehended. The officers placed Holley in handcuffs and walked him to a patrol car. Holley said that he did not have his license on him or in the car and he did not have any documentation for the car.

Giglietta then took possession of Holley while Singleton went to check the car. Because she could not see inside the car that Holley was driving, she went to the car and opened the door to make sure that nobody was still inside. She also

5

needed to open the door to do a window tint check and get the paperwork for the car to determine the registration and insurance.  When Singleton opened the door, she immediately noticed a handgun between the driver's seat and the center console and a very strong odor of marijuana.  A search of the car was conducted that recovered controlled substances in the front half of the vehicle.

On this record, opening the car door to test the window tint did not violate the Fourth Amendment since it satisfied the factors in <u>Class</u> -- the safety of the officers was served by the governmental intrusion, the intrusion was minimal, and the search stemmed from some probable cause focusing suspicion on the individual affected by the search.  First, opening the car door served two purposes: it enabled the officers to enforce the window tint regulation, and, because Holley had fled the car during the traffic stop, it mitigated the risk to the officers posed by returning Holley to the car.  <u>See</u> <u>id</u>. at 116-18.  Like the VIN in <u>Class</u>, the regulation of window tint is at least partly based on the state's interest in protecting officers during traffic stops.  <u>See</u> <u>United States v. Stanfield</u>, 109 F.3d 976, 981-82 (4th Cir. 1997) (discussing the danger to officers in approaching a vehicle with darkly tinted windows) (persuasive authority).  Moreover, just as in <u>Class</u>, Holley voluntarily exited the car before he was arrested for resisting arrest, and the officers' safety was protected by not returning Holley to the car to have him roll down the window.  If they had, Holley would have had access to the gun tucked between the

6

driver's seat and the center console within the partial concealment of the car's exterior and the darkly tinted windows. Thus, the intrusion of the officers in opening the door to check the tint served officer safety both by enforcing a statute partially based on protecting officers during traffic stops and by ensuring their safety during the actual traffic stop by preventing possible access to a weapon.

Second, the intrusion in opening the car door was minimal. Class, 475 U.S. at 117-19. As the record reveals, it was necessary to roll down the window in order to test if the window tint was in compliance with Florida law. If he had remained in the car, the officers could have required Holley to roll down the window. See id. at 115. However, because Holley voluntarily exited the vehicle, the officers needed to open the door and roll down the window in order to test the tint -- just as the officer moved papers in Class in order to see the VIN on the dash. Also like the search in Class, opening the door in order to access the window was narrowly focused on the purpose of testing the darkness of the tint.

Third, the search stemmed from probable cause focusing suspicion on the individual affected by the search. Id. at 111-14, 117, 119. It is uncontested that the initial traffic stop -- based on Holley's failure to completely stop at a stop sign and the officers' observations that the window tint likely violated Florida law -- was valid. See Pierre, 825 F.3d at 1192. So, just as opening the door to locate the VIN in Class was directly related to the basis of the traffic stop and well within its

7

scope, so too was opening the door to roll down the window and check the tint. Holt, 777 F.3d at 1256.

Because the district court correctly concluded that the officers could open the car door in order to test the window tint, the district court correctly denied Holley's motion to suppress. Once the door was open, the discovery of the gun in plain sight and the strong odor of marijuana gave the officers probable cause to search the rest of the car for contraband. We affirm Holley's convictions.

**AFFIRMED**.

8